UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| Roderick Buotote, | |
| *Plaintiff*, | Civil No. 3:09cv2144 (JBA) |
| *v.* | |
| Illinois Tool Works, Inc., *d/b/a* ITW Highland, | August 30, 2011 |
| *Defendant.* | |

RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Roderick Buotote sued Defendant Illinois Tool Works, Inc. d/b/a ITW Highland ("Highland") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1).[1] Defendant moves for summary judgment on all counts, and for the following reasons, Defendant's motion for summary judgment will be granted in full.

I. Factual Background

Buotote, who is currently 59 years old, worked for Highland for more than 32 years, beginning in August of 1976, until he was laid off in February 2009. (Buotote Aff., Ex. 1 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 33] ¶ 2.) Highland is a high–precision manufacturer of parts for end–product manufacturers, largely in the automotive industry. (Weber Aff., Ex. 1 to Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 29] ¶ 3.) Buotote started his employment as a machine operator and was subsequently promoted to tool setter, tool maker, team leader, and ultimately manufacturing supervisor in 2003. (Buotote Aff. ¶ 2.)

---

[1] Plaintiff also sued under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq.* but has since dropped that claim.

A. Buotote's Injuries

During the course of his employment with Highland, Buotote suffered several injuries. In 2000, Buotote underwent back surgery that caused him to be out of work for nine months. (Buotote Aff. ¶ 4.) He filed a claim for workers' compensation benefits for that injury with a 17–percent disability rating. His claim for additional benefits related to this injury is pending. (*Id.*)

In 2003, Buotote was involved in a serious motorcycle accident that resulted in significant injuries, including a stroke, which required him to take blood thinning medication and be out of work for a month. (*Id.*) Due to continuing difficulties from the motorcycle injuries, Buotote began physical therapy for his hip and pelvis and was out of work from August 31, 2008 to November 11, 2008. (*Id.* ¶ 5.) In December of 2008, Buotote "suffered a rupture to [his] nose," which "was thought to be due to high blood pressure." (Buotote Aff. ¶ 6.)

Buotote continues to suffer from multiple physical impairments, including the injuries to his back, hip, and pelvis resulting from his back injury and surgery in 2000 and motorcycle accident in 2003 as well as impairment of his circulatory system due to his stroke in 2003. (*Id.* ¶¶4–5.)[2] However, in his deposition Buotote only claimed a disability to his back. (Buotote Dep. II, Ex. 11 to Def.'s Loc. R. 56 (a)1 Stmt. at 62:8–63:4.)

---

[2] In briefing, Defendant represents that Plaintiff was also involved in another motorcycle accident on August 31, 2008, which caused a fractured pelvis, dislocated hip, fractured ribs and left side laceration of the lower leg. (Def.'s Reply at 12.) However, this information is not in the record that either Defendant or Plaintiff provided. In the record, Buotote does state that he has no "permanent impairment to any of [his] body parts because of that injury in August of 2008," nor "lasting problems" because of a motorcycle accident. (Buotote Dep. I, Ex. 10 to Def.'s Loc. R. 56 (a)1 Stmt, 9:15–18, 87:2–4.)

> Question: Well, are you disabled?
> Answer: Yes.
> Question: What is your disability?
> Answer: My back.
> Question: Other than your back, do you have any other disability?
> Answer: No.
> Question: And what is the nature of your disability with your back?
> Answer: I keep having muscle spasms.
> Question: Anything else other than the fact that you keep having muscle spasms?
> Answer: While I'm standing or sitting, long walks.
> Question: Anything else other than muscle spasms, no prolonged standing or sitting, and your inability to go on long walks?
> Answer: Not at this moment.
> Question: So as you're sitting here today, you can think of nothing else other than muscle spasms, your inability to engage in prolonged standing or sitting, and your inability to do long walks?
> Answer: With the lifestyle I'm living, no.

Buotote claims that because of these injuries, many of his everyday activities are limited, including sleep, sitting, or standing for long periods of time, lifting heavy objects, and performing manual tasks. (Buotote Aff. ¶ 6; Buotote Dep. II at 62:10–67:11.) Specifically, he states that for him a long walk is "half a mile," prolonged standing is "an hour, two hours," and prolonged sitting is "about an hour–and–a–half, two hours." (Buotote Dep. II at 62:5–25.) After prolonged sitting, Buotote has "to stand for a while to get [his back] back in motion." (*Id.*) After he stands for about 15 to 20 minutes, he is able to resume his activities. (*Id.*)

Buotote further explained that he has not been able to work out or lift weights since his back surgery. (*Id.* at 65:6–66:8.) He also has not been able to perform household chores, such as moving furniture, or doing yard work, such as cutting down trees or caring for his lawn. (*Id.* at 65:11–67:11.) Buotote maintains that he has had all of these restrictions since

his back injury. (*Id.* 67:4–8.) Other than these limitations, Buotote recalls no other limitation "that substantially limits one or more of his major life activities." (*Id.* 67:9–11.)[3]

B. Termination

On November 13, 2008, faced with declining sales and projections that it would lose 35 percent of its revenues in the last quarter of 2008 and the first quarter of 2009, Highland decided to terminate 12 employees from a workforce of 136, a nine percent workforce reduction. (Weber Aff. ¶¶ 7, 12; Melchionna Aff., Ex. 2 to Def.'s Loc. R. 56(a)1 Stmt. ¶ 11.) In accordance with Highland policy and past practice, Business Unit Manager Robert Weber and Human Resources Manager Judith Melchionna reviewed Highland's operations to determine which positions could be eliminated. (*Id.*) Once a position was selected, if there was only one employee in that position, that employee would be terminated. However, where there was more than one person in a position, Weber and Melchionna would review the skills and ability of each incumbent. (*See* Weber Aff. ¶¶ 13–14; Melchionna Aff. ¶¶ 12–13.) If skills and ability were comparable among all of the incumbents, Highland's practice and policy directed that length of service or seniority would be the deciding factor for which employees would be retained and which would be terminated. (*Id.*)

As economic conditions continued to worsen into January 2009, Highland decided to terminate six additional positions and to take further cost–reducing steps, namely switching production workers to a four–day work week and reducing compensation for salaried employees. (Weber Aff. ¶16; Melchionna Aff. ¶15.) Buotote admits that during

---

[3] Plaintiff now argues that his circulatory system is also impaired, and he bleeds and bruises easily. (*See* Pl.'s Response at 9.) While he stated during his deposition that he had "a problem with bleeding" in 2003, it is unclear what the impairment he discusses in his response brief refers to.

4

January 2009, Highland was "very slow," not all of the machines were running, and at times he had to find "busy work" for the shift of 25 employees he supervised. (Buotote Dep. I at 51:1–24.)

One of the positions Weber and Melchionna targeted for termination was manufacturing "shift supervisor." As of January 2009, Highland's employees worked in three shifts, supervised by Weber, who had additional management responsibilities, Buotote, and Mike Salvatore, respectively. (Weber Aff. ¶ 17–18, 22; Melchionna Aff. ¶ 17.) During Buotote's and Salvatore's respective shifts, each was the "highest ranking" individual in the facility. (Buotote Dep. I at 14.) Buotote and Salvatore had the same job description, duties, responsibilities, and salary range, although Salvatore had worked for Highland two years longer than Buotote.

The first shift, overseen by Weber, was the largest, and he was assisted by six "team leaders," who were hourly employees with supervisory responsibilities in their respective departments. (*Id.*) Buotote worked as a team leader until 2003 when he was promoted to shift supervisor. (*See* Buotote Dep. II at 106:10–107:10.) He nonetheless remained listed in the 2008 edition of Highland's internal telephone directory as "Team Co-ordinator (Nights)." (ITW Highland Telephone Directory, Ex. 4 to Pl.'s Loc. R. 56(a)2 Stmt.; Buotote Aff. ¶ 12.) The directory was prepared without the consultation of human resources and included several inaccuracies. (Melchionna Aff. II, Ex. 1 to Def's Reply ¶ 7).

To eliminate a shift supervisor in early February 2009, Weber and Melchionna reviewed the skills and abilities of Buotote and Salvatore and found them comparable. (Weber Aff. ¶ 22; Melchionna Aff. ¶ 21.) However, when they compared seniority status,

5

Buotote's lower seniority status indicated that he had to be the person selected for position elimination. (*Id.*)

Although Buotote agrees that Salvatore had about two years more experience, he denies that their skills and abilities were comparable and provides numerous factors indicating he was the better candidate: he supervised twenty–six employees, while Salvatore only supervised eight; he had first–aid responder responsibilities, which Salvatore lacked;[4] he was on 24–hour call for the ADT alarm system, which Salvatore was not; he had been highly praised for his supervisory abilities by Weber, Melchionna and Mr. Jack LaVeck, a production manager; and had a lower salary than Salvatore. (Buotote Aff. ¶ 11.)

On February 2, 2009, Buotote was told that his position had been eliminated. (Weber Aff. ¶22; Melchionna Aff. ¶ 21.) During his termination meeting, Buotote told Weber and Melchionna that he wanted to continue working and would accept any other position, even one that would result in "a demotion or cut in pay." (Buotote Aff. ¶ 11.) Melchionna responded that "there were no openings available for tookmaking." (Buotote Dep. at II 36:6–38:2.) Buotote has conceded that there were no open positions at the time, but he specifically informed Weber that at least two other individuals, who were in non–supervisory roles, were going to retire very soon and that he was willing and qualified to assume those positions. (*Id.*; Buotote Aff. ¶ 15.) Furthermore, Buotote maintains that Weber told him that he was on the call–back list, would be eligible for recall if a position

---

[4] Highland argues that even if it had considered Plaintiff's first responder training as a relevant factor in assessing their relevant abilities, Salvatore was also trained as a first responder. (Melchionna Aff. II, ¶¶ 3–5.)

6

opened up, and Highland would notify him when such an opportunity arose. (Buotote Dep. II at 36:6–38:2.) Weber denies doing so. (Weber Aff. ¶ 23.)

Highland claims that under its company policies, "position elimination" has a specialized meaning and is distinct from "layoff." (Weber Aff. ¶ 8; Melchionna Aff. ¶ 7; *see also* ITW Layoff and Recall Policy, Ex. 3 to Def.'s Loc. R. 56(a)1 Stmt.) Specifically, a "layoff" is considered of short duration, during which an employee is not eligible for severance or a COBRA subsidy but does retain recall rights. (*Id.*) By contrast, when a position is eliminated, the employee is not eligible for recall but is eligible for a severance and COBRA subsidy, retirement, and access to his or her 401k account. (*Id.*; *see also* ITW's Separation Pay Plan and Summary, Ex. 4 to Def.'s Loc. R. 56(a)1 Stmt.) In reviewing the economic condition of Highland, Weber and Melchionna concluded that position eliminations were the best choice for both the employees and the company during both rounds of workforce reduction. (Weber Aff. ¶ 11; Melchionna Aff. ¶ 7.) Thus, Buotote's position was eliminated, and Defendant forced him to accept a severance payment. (Buotote Aff. ¶ 17.)

C. Bumping Rights

Although Buotote asked Weber and Melchionna to allow him to take over any other position in the company even if it meant demotion, Highland does not give employees "bumping rights," which would allow them to assume other occupied positions in the company or in other divisions when faced with position elimination. (Weber Aff. ¶ 24; Melchionna Aff. ¶ 23.)

Highland is one of several independent divisions of Illinois Tool Works that operate in Connecticut, and each division consults with the others about job openings in their respective divisions. (*Id.*) On occasion there would be a vacancy, and human resources

managers including Melchionna would refer position–eliminated employees to those positions. (*Id.*) However, in such cases, the employee would have to apply and be considered in the same applicant pool as all candidates responding to an advertisement. (*Id.*) In conjunction with the November 2008 and February 2009 position eliminations, Melchionna consulted with her peers in other divisions and found no openings to refer Plaintiff to. (*Id.*)

      D.      Failure to Recall

After his termination, Buotote called Weber on a weekly basis in February and March of 2009 to inquire as to whether there were any available opportunities. (Buotote Dep. II at 52:1–17; Buotote Aff. ¶ 20.) Each time he called, Weber took his call, informed him that there were no positions available at Highland and told him of other opportunities that he believed were available for someone with Buotote's skills and job history. (Weber Aff. ¶ 24.)

In the late spring of 2009, Mr. Walt Zambrewski, a tool specialist, retired and Highland placed an advertisement on the Connecticut Department of Labor website in June and again in August of 2009 for a Class A toolmaker to replace him. (Melchionna Aff. ¶ 31.) Buotote claims he was not given notice of this position in either June or August, nor was he aware of the advertisements at the time they were posted. (Buotote Aff. ¶ 20.) He asserts that Weber promised him that he would be contacted once a position came available but failed to do so before the advertisements were posted, breaking both his promise and violating company policy. (Buotote Aff. ¶ 20; Buotote Dep. II at 83:3–16.) The only reason Buotote became aware of the advertisements was because his brother mentioned seeing them in the newspapers. When Buotote saw the advertisements, he made copies for his lawyer but did not apply. (Buotote Aff. ¶ 20; Buotote Dep. II at 83:14– 85:19.)

II. Discussion[5]

Buotote claims that he was discriminated against because of his disability in violation of the ADA (Count Two) and the CFEPA (Count Three). Defendant argues that Plaintiff's claims must fail because there is insufficient evidence of Plaintiff's disability and substantial limitations, both elements of an ADA and a CFEPA *prima facie* case, and because there is no evidence that the proffered legitimate reason for termination, Defendant's workforce reductions conducted pursuant to company policy, were pretextual.[6]

A. Disability

1. *Disability Defined*

A person is disabled under the ADA if he or she has: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a

---

[5] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non–moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

[6] The parties do not dispute two of the elements of Plaintiff's *prima facie* case: that Highland is subject to the ADA and that Plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation. (Def.'s Mot. at 28; Weber Aff. ¶ 37; Melchionna Aff. ¶ 39); *see Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001) (setting forth the framework for deciding an ADA claim).

record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(1).[7]

The determination of whether Plaintiff does or does not have a disability covered by the ADA uses a three–step approach outlined in *Bragdon v. Abbott*, 524 U.S. 624 (1998). Under this approach, a "plaintiff must first show that he suffers from a physical or mental impairment; . . . [s]econd, plaintiff must identify the activity claimed to be impaired and establish that it constitutes 'a major life activity'; . . . [and t]hird, the plaintiff must show that his impairment 'substantially limits' the identified major life activity. *Weixel v. Bd. of Educ.*, 287 F.3d 138, 147 (2d Cir. 2002)(citations omitted). Regulations of the Equal Employment Opportunity Commission ("EEOC") further define the term "substantially limited" as: "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). Factors considered in determining whether an individual is substantially limited in a major life activity include: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of

---

[7] Major life activities " include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Major life activity may also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

The ADA and CFEPA do not provide coextensive disability discrimination coverage; the CFEPA does not contain a requirement that a plaintiff's impairment substantially limit a major life activity. *Beason v. United Techs. Corp.*, 337 F.3d 271, 276 (2d Cir. 2003) ("Absent similar [substantial limitation] language in the CFEPA, we believe the Connecticut Supreme Court would decline to find the CFEPA possesses the same restrictive threshold.").[8] The CFEPA defines the term "[p]hysically disabled" as "refer [ring] to any individual who has any chronic physical handicap, infirmity or impairment." Conn. Gen. Stat. § 46a-51(15).

### 2. *Plaintiff's evidence of disability and substantial limitation*

Buotote argues that he continues to suffer from multiple physical impairments, namely the injuries to his back, hip, and pelvis resulting from his back injury and surgery in 2000 and motorcycle accident in 2003. Additionally, he claims impairment of his circulatory system caused by his stroke in 2003; however, as noted above, in his deposition Buotote claimed only to suffer from a disability to his back. (*See* Buotote Dep. II at 62:8–63:4.) There is no contrary evidence in the record, and there is no evidentiary support for his assertion in his opposition to summary judgment that the stroke in 2003 caused him long–lasting circulatory problems. In the absence of evidence of injury other than to Plaintiff's back, the Court will only consider his back injuries in addressing the challenge to his ADA and CFEPA claims.

---

[8] The CFEPA does not provide for a cause of action for perceived disability discrimination. *See Beason*, 337 F.3d at 279.

Buotote stated during his deposition that his back injury substantially impaired his ability to sit, stand, walk, perform household chores, and work out. (Buotote Dep. II at 62:10–67:11.) While most of these activities fall within the category of an ADA major life activity,[9] Buotote has not provided evidence of a disability that substantially limits one or more of these activities, particularly when evaluated in light of the first EEOC factor: "the nature and severity of the impairment" as compared with the average person's ability to perform those activities. *See* 29 C.F.R. § 1630.2(j)(2).

Although Plaintiff indisputably suffered injury to his back, he offers no medical support in the record to substantiate the specific limitations that he claims he suffers, nor for his assertion that his impairment is chronic as required under the CFEPA. "Courts in the Second Circuit have consistently held that when a plaintiff fails to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his conditions, he cannot establish that he is disabled within the meaning of the ADA." *Baerga v. Hosp. for Special Surgery*, No. 97 Civ. 0230(DAB), 2003 WL 22251294, *6 (S.D.N.Y. Sept. 30, 2003) (citing *Johnson v. St. Clare's Hospital & Health Center,* No. 96 CIV. 1425(MBM), 1998 WL 236235, *8, (S.D.N.Y. May 13, 1998); *Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 392 (S.D.N.Y.1998) ("[Plaintiff's] testimony as to the (alleged) limits on his ability to walk, without supporting medical testimony, simply is not sufficient to establish a prima

---

[9] While walking, standing and sitting are expressly delineated within the statute as major life activities, performing housework other than basic chores has been deemed not to be a major life activity. With respect to Buotote this would include his being unable to perform necessary yard work, such as lifting rocks, and lifting furniture. *See Colwell v. Suffolk Co. Police Dep't*, 158 F.3d 635, 643 (activities such as driving, doing mechanical work on cars, moving furniture, doing yard work, shoveling snow and other physical exercise in the wintertime do not constitute major life activities).

facie case under the ADA."); *Sussle v. Sirina Protections Syst. Corp.*, No. 01 CIV 3787(WK), 2003 WL 21346935, *12-14 (S.D.N.Y. Jun.10, 2003) (plaintiff's failure to offer medical evidence substantiating the alleged limitations that Hepatitis C had on his ability to have sexual relationships precluded him from establishing that he suffered a disability within the meaning of the ADA)); *see also Colwell v. Suffolk County Police Dept.*, 158 F. 3d 635, 644 (2d Cir. 1998) (concluding that plaintiff's description of sleep impairment was not sufficient on its own to demonstrate an impairment that substantially limits the major life activity of sleep).[10]

Plaintiff's counsel maintained at oral argument that despite the lack of medical evidence of disability and limitation, Plaintiff has been given a "permanent disability rating to [his] back of 17%," which corroborates the existence of disability and limitations. However, Plaintiff provides no context for the functional meaning of a 17–percent rating, and disability determination for workers compensation are based on a "completely different standard than [those] imposed by the ADA" and state–law analogues. *See Shepherd v. Buffalo Psychiatric Center*, No. 05cv563C, 2009 WL 5042629, *3 (W.D.N.Y. Dec. 15, 2009).[11]

---

[10] Although the CFEPA applies more broadly than the ADA, the evidentiary standards for the two statutes are the same, and they are therefore often examined in conjunction. *See, e.g., Buck v. AT&T Servs., Inc.*, No. 3:08cv1619(JCH), 2010 WL 2640045, *1 n.1 (D. Conn. June 28, 2010) ("Connecticut courts generally analyze ADA and CFEPA claims under the same standard."). Thus, although the CFEPA has no "substantial limitation" requirement, the need for corroborating evidence of disability under the ADA is also required under the CFEPA.

[11] The ADA implementing regulations effective prior to May 2011, 29 C.F.R. § 1630.2(k), caution that a worker compensation or veterans disability rating is not interchangeable with strict statutory definitions of disability:

The fact that an individual has a record of being a disabled veteran, or of

Because Plaintiff provides no evidence of his disability beyond his own testimony and a disability rating that lacks context or other helpful guidance, from which the extent or duration of his impairment or limitation may be discerned, and more is required in the Second Circuit, Plaintiff has failed to demonstrate ADA or CFEPA disability, and summary judgment will enter on his CFEPA claim.

### 3. *Perceived Disability*

Buotote also claims that the decision to eliminate his position was based on his "perceived disability," in violation of the ADA as amended in 2009, under which an ADA violation is proved "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). However, a perceived disability claim may not be based upon an impairment that is "transitory and minor," meaning having "an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

Buotote maintains that Melchionna and Weber perceived him to be disabled based on their knowledge that he sustained a back injury in 2000 and was involved in a serious motorcycle accident, evidenced in part by several statements they made including Melchionna's frequent warnings to him that he should "watch it" to avoid "get[ing] hurt

---

      disability retirement, or is classified as disabled for other purposes does not guarantee that the individual will satisfy the definition of "disability" under part 1630. Other statutes, regulations and programs may have a definition of "disability" that is not the same as the definition set forth in the ADA. and contained in part 1630.

*See id.*

because of [his] back" (Buotote Dep. II at 69:1–17); Weber's remark in November 2008 that Plaintiff is "out of work more than [he is] in work . . . [he] ha[s] a lot of bad luck" (*id.* at 22:25–23:2); and Melchionna's inquiry upon learning that he had ruptured his nose and took blood–thinning medication in December 2008: "[o]h, what's next?" (*id.* at 27:9–12). Buotote further testified that Highland knew he was restricted in his ability to lift heavy objects. (*Id.* at 81:3–25.) While Weber and Melchionna each aver that they were unaware of whether Plaintiff was still disabled when deposed, and they were each unaware of any activities that he has curtailed because of his various injuries (Weber Aff. ¶ 37; Melchionna Aff. ¶ 39), it can reasonably be inferred from their statements that they perceived Plaintiff as suffering from lasting injuries, which is sufficient under Section 12102(3)(A).

B. Legitimate reason for termination

Although the record contains sufficient evidence for a fact–finder to reasonably infer that Weber and Melchionna perceived Buotote to be disabled under the ADA, Buotote has failed to provide evidence that his perceived disability played a role in Defendant's decision to eliminate his position. Highland contends that Buotote has failed to adduce sufficient evidence that his termination occurred under circumstances that could give rise to an inference of disability–based discrimination or that Defendant's legitimate, nondiscriminatory reason claimed for his termination was pretextual. To prove pretext, Plaintiff must offer evidence upon which a reasonable fact–finder could conclude that the offered business reason is false and that Plaintiff's disability was the motivating factor in the decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Defendant's proffered reason for terminating Plaintiff's position was that because of the economic downturn, it was forced to undergo two rounds of major workforce

reductions, which it carried out in compliance with its company policy by making its termination decisions based on seniority, choosing to lay–off Plaintiff as opposed to the more senior Salvatore. Buotote acknowledges that Salvatore was more senior and that they were "equal" in ability as supervisors. (Buotote Dep. II at 120:1–3.) Buotote nonetheless argues that because he was qualified as a first–aid responder, had been praised for his supervisory skills, and received a lower salary than Salvatore, he was more valuable to Highland than Salvatore, such that it should have set aside its termination policy and retained him over Salvatore. To show pretext by differential in qualifications, the plaintiff's credentials "would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Byrnie v. Town of Cromwell*, 243 F.3d 93, 103 (2d Cir. 2001). Plaintiff's evidence falls far short of this benchmark.[12]

As evidence of pretext, Plaintiff also points to the aforementioned remarks made by Weber and Melchionna to him, that he "[is] out of work more often than [he is] in work" such that "his luck should change" and wondering "what's next." However, even if those statements evince discriminatory animus, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false and that discrimination was

---

[12] Plaintiff, a shift supervisor, also contends that Defendant's decision to terminate him instead of "team leaders" evinces pretext, however, the two positions had different responsibilities and benefits—shift supervisors were salaried employees with enhanced benefit packages not provided to team leaders (Weber Aff. ¶¶ 18 & 20; Melchionna Aff. ¶ 19)—such that team leaders are not proper comparators, and their employment status after the February 2009 layoffs do not reveal discriminatory intent underlying Plaintiff's termination. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("[T]here should be an 'objectively identifiable basis for comparability'" shown by "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases.").

the real reason,'" *Sanchez v. Connecticut Natural Gas Co.*, No. 10–1589–cv, 2011 WL 1625981 (2d Cir. Apr. 29, 2011) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)), and there is no evidence that the reasons provided, that Defendant needed to layoff a substantial part of its workforce, and Plaintiff was less senior than Salvatore, were false.

In sum, Weber and Melchionna's remarks and Defendant's decision to retain the more senior Salvatore in compliance with its policy do not provide sufficient evidence upon which a reasonable fact–finder could conclude that Highland's proffered legitimate reason is false and that it terminated Plaintiff's employment because of his disability or perceived disability, and summary judgment is granted on his ADA claim.

C. Failure to Recall

Buotote also claims that after he was terminated, Highland's refusal to recall or rehire him violated the ADA. He maintains that Weber made several promises to recall him should an opening occur at Highland, but Weber denies ever doing so and notes that Plaintiff's severance plan explicitly provided he had no recall rights. (Buotote. Aff. ¶ 20; Weber Aff. ¶ 23.) In order to establish a *prima facie* case based on an alleged failure to hire, or to promote, or to recall, Plaintiff must show that he:

> (1) is a member of a protected class; (2) applied and was qualified for a job for which the employer was seeking applicants; (3) was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.

*Aulicino v. N.Y. City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004)). The principal dispute between the Plaintiff and the Defendant with respect to this claim is whether Buotote can obtain relief even though he did not actually apply for the position. (Buotote Dep. II at 83:14– 85:19.)

Generally, a plaintiff alleging failure to recall must show that he or she applied for the specific position at issue to pinpoint the instance of alleged discrimination by the employer. *See Gupta v. New York City Sch. Constr. Auth.*, 305 Fed. App'x. 687, 690 (2d Cir. 2008) (dismissing plaintiff's discrimination claim that his employer's failure to recall him was retaliation for having filed a complaint, because plaintiff never applied for the particular position); *Petrosino*, 385 F.3d at 227 (reasoning that the requirement of an actual application cannot be excused because it would place an unfair burden on employers "to keep track of all [former] employees who have generally expressed an interest in [being rehired] and [to] consider each of them for any opening for which they are qualified but did not specifically apply"); *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) (affirming a dismissal of a complaint where plaintiff had not alleged that she applied for a particular position because she believed it was futile to have applied for the promotion). A plaintiff is excused from the specific–application requirement where "(1) the vacancy at issue was not posted, *and* (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Petrosino*, 385 F.3d at 227 (emphasis added).

Buotote states that Defendant provided him no notice of openings for "Class A toolmakers" in June and August 2009. (Buotote. Aff. ¶ 20.) However, Buotote admitted in his deposition that he learned of the job postings through advertisements his brother read in various newspapers, shortly after the openings were posted. When he saw the advertisements, he made copies and gave them to his lawyer. (Buotote. Aff. ¶ 20; Buotote Dep. II at 83:14–85:19.) While Buotote maintains that he did not reach out to Weber or Highland because it was company policy that he would be called back when a position

became available, he points to no evidence by his affidavit or otherwise that the vacancy was never posted, that he had no knowledge of the position before it was filled, or that he unsuccessfully attempted to apply unsuccessfully. Thus, Buotote has failed to establish his *prima facie* case based on alleged failure to recall, and summary judgement is granted on his claim of failure to recall.

III.    Conclusion

Accordingly, Defendant's [Doc. # 29] Motion for Summary Judgment is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of August, 2011.